David A. Kubichek WSB #5-2534
Assistant United States Attorney
District of Wyoming
P.O. Box 22211
Casper, WY  82602-5010
307-261-5434 (phone)
307-261-5471 (fax)
david.kubichek@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **MIGUEL ANGEL ORDAZ,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **Civil No. 15-CV–4-F** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Respondent. | ) | |

## UNITED STATES' RESPONSE TO
## DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255

On January 13, 2015, the Defendant/Petitioner Miguel Angel Ordaz ("Defendant") filed a motion under 28 U.S.C. § 2255 pursuant to which he seeks to vacate his conviction and 65 year sentence for assorted methamphetamine trafficking and firearms offenses (Doc. 1).  In support of his motion, he claims that his attorney was constitutionally ineffective for not seeking independent laboratory testing of alleged methamphetamine seized from a black bag found during a search of his home (Doc. 1 at 5-9).  He also claims the evidence supporting his conviction for possessing a machine gun in furtherance of his methamphetamine trafficking activities was legally insufficient (Count 13) (*Id.* at 9-12).  For the reasons outlined below, neither claim can be sustained.

# BACKGROUND[1]

On January 12, 2011, the Defendant was charged by superseding indictment with conspiracy to traffic in methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A) (Count One); conspiracy to launder money, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h) (Count Two); possessing firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Counts Ten and Twelve); possessing methamphetamine with intent to distribute, in violation of §§ 841(a)(1) and (b)(1)(B) (Count Eleven); possessing a machine gun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(B)(ii) (Count Thirteen); and possession of a firearm not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d) and 5871 (Count Fourteen) (Doc. 64).

The Defendant pleaded not guilty, and a jury trial commenced on September 27, 2011 (Vol. II [Presentence Report], ¶ 3).[2]  On November 4, 2011, the jury returned a verdict of guilty as to each count (Trial. Tr., Vol. XX at 13-15).

On March 2, 2012, the United States filed a motion to dismiss Count Ten.  The district court subsequently granted that motion (Doc. 559).

On March 5, 2012, the district court sentenced the Defendant to a term of 120 months imprisonment as to Counts One, Two, Eleven and Fourteen, 30 years as to Count Thirteen, to run consecutively to all other counts, and 25 years as to Count Twelve, also to be served

---

[1] References to the record will be to the clerk's certified record on appeal which was compiled in connection with proceedings on the Defendant's direct appeal.  References to the record on appeal will be by document number and page number within the document where appropriate (*i.e.,* Doc. ___).  Citations to the transcript of the trial proceedings will be by reference to the transcript volume number and page number (*i.e.,* Trial Tr., Vol. ___, at ___).  Citations to exhibits will be designated to the exhibit number and page in the Addendum (*i.e.,* Exhibit ___, Add. at _____).

[2] The Defendant was joined in trial by co-defendants Renteria, Garcia and Velasquez.  Each of the other defendants named in the superseding indictment had previously pleaded guilty.

consecutively to all other counts (Doc. 593 at 35).   He also received five years of supervised release (*Id.*), a $2,000 fine and a $600 special assessment (Doc. 544 at 37-38).   The criminal judgment incorporating that sentence was filed of record on March 6, 2012 (Doc. 564).   The Defendant filed his timely notice of appeal on the same date (Doc. 565).

On appeal, the Defendant argued that the evidence in support of Count Thirteen was legally insufficient because it failed to demonstrate that his possession of the subject machine gun was actually in furtherance of his methamphetamine trafficking activities as required by 18 U.S.C. § 924(c).   *United States v. Renteria*, 720 F.3d 1245, 1254-55 (10th Cir. 2013).   Second, he challenged the sufficiency of the evidence with respect to Count Twelve, which charged him with possessing multiple firearms in furtherance of possessing methamphetamine with intent to distribute.   *Id.*   He further contended that there were defects in the legal instructions concerning Count Twelve, and that the § 924(c) charges in Counts Twelve and Thirteen were multiplicitous. *Id.* at 1255-56.   Finally, he claimed that the court abused its discretion by admitting "gang affiliation" evidence and by permitting a government witness to engage in improper "bolstering." *Id.* at 1256.

The court of appeals rejected each of those claims on June 27, 2013.   *Id.* at 1245.   The Defendant sought further review in the Supreme Court, but his petition for certiorari was denied by the Court on January 13, 2014.   *Ordaz v. United States*, 134 S. Ct. 969 (Jan. 13, 2014).[3]

The historical facts which led to all this trouble for the Defendant were abundant, as the record from the trial showed.

In October of 2009, special agents from the Wyoming Division of Criminal Investigation ("DCI") began compiling information which indicated that several members of the Fresno

---

[3] Because the Defendant's § 2255 motion was filed within a year of that date - on January 13, 2015 - it is timely for purposes of § 2255's one year limitation period.   *United States v. Prows*, 448 F.3d 1223, 1227 (10th Cir. 2006).

Bulldog gang, who were living in northern Wyoming, were distributing methamphetamine in that area (Trial Tr. at 718-23).   DCI Special Agent Hall ("SA Hall") identified several individuals who eventually became targets of the investigation, including Robert Velasquez, Jr. ("Velasquez") (*Id.* at 720-21), Raymundo Correa ("Correa") (*Id.* at 721), the Defendant (*Id.* at 721), Renteria (*Id.* at 722), Kimberley Marie Perkins ("Perkins") (*Id.* at 722-23), John Michael Morgan ("J. Morgan") (*Id.* at 723), Danny Hernandez ("Hernandez") ( *Id.* at 723), and Alex Garcia, Jr. ("Garcia") (*Id.*).   The Defendant and Renteria were living in Sheridan, Wyoming during the investigation, and Velasquez was primarily living in the Cody and Basin, Wyoming areas (*Id.* at 720-23).   Correa, Hernandez and Garcia were living in Fresno, California (*Id.*).

At trial, SA Hall testified that his investigation revealed that Velasquez, Renteria and the Defendant received supplies of methamphetamine from various members of the Fresno Bulldogs in Fresno, California, including Correa (aka "Ray-Ray"), Hernandez and Garcia (*Id.* at 720-23). After selling the methamphetamine, Velasquez, the Defendant and Renteria would wire transfer some of the proceeds from those sales back to Fresno in order to secure additional supplies of methamphetamine (*Id.*).   SA Hall specifically identified Renteria and the Defendant as the individuals in Sheridan, Wyoming who received packages of methamphetamine from Fresno (*Id.* at 721-22).   He further identified the Defendant's use of various aliases, including Isaias Rivera and Tomas Hueso, Jr. (*Id.*).   SA Hall also received financial records from Money Gram, Western Union and Green Dot which showed that Renteria and the Defendant were involved in multiple wire transactions (*Id.* at 727; Exhibits 5000, 5002).

Agent Hall also testified that Renteria, the Defendant, Velasquez, Garcia, Correa and Hernandez were all confirmed members of the same street gang in Fresno, the Fresno Bulldogs (*Id.* at 728).   He further indicated that Velasquez was primarily distributing the

methamphetamine he received from Fresno in the Big Horn Basin of northern Wyoming, while Renteria and the Defendant primarily operated in Sheridan, Wyoming (*Id.* at 766-69).

Detective Ricardo Gonzalez of the Fresno, California Police Department stated that he was a member of the Fresno Police Department gang unit, and that he had investigated the Fresno Bulldog gang for nine years (*Id.* at 999-1000).   He specifically identified the Defendant (*Id.* at 1013) as a member of the Varrio Fifth Street gang, a subset of the Fresno Bulldog gang (*Id.* at 1010).   He also identified photographs seized during the investigation of several key players, including Renteria, Hernandez, the Defendant, Velasquez and Garcia (*Id.* at 1016-1031). Detective Gonzalez also identified Fresno Bulldog gang related features in the photographs, such as tattoos, clothing and hand signals (*Id.*).   He verified that members of the Fresno Bulldog gang were engaged in the sale of illegal narcotics (*Id.* at 1016), and that methamphetamine in Fresno sells for between $1,500 and $2,500 an ounce (*Id.*).

Several other witnesses testified about their purchases or receipt of methamphetamine from Renteria, the Defendant and Velasquez.   Lisa Riggs ("Riggs"), for example, discussed making four controlled purchased of methamphetamine from Velasquez between November 5, 2009, and January 5, 2010 (*Id.* at 1191, 1202-1240).   Riggs also testified that Velasquez had told her that he was a member of a gang in California (*Id.* at 1241).

Next, Juan L. Marquez ("Marquez") testified that prior to his becoming a confidential informant, he had purchased methamphetamine from Velasquez for approximately one year (*Id.* at 1283-85).   He subsequently made controlled purchases of methamphetamine from Velasquez on January 15, 2010 (*Id.* at 1288-93, and one addition time "a week or two later" (*Id.* at 1293). Marquez testified that Velasquez told him that he was in a gang in California, and that he was

getting his drugs through the mail from California (*Id.* at 1309).  In that regard, Marquez recalled

a phone call he overheard Velasquez make prior to Marquez's work as a confidential informant:

> I heard him have a phone call one time with a guy, telling him he needed to re-up
> or needed to get some more.  Needed to hurry up and send him some more.
> There's lots of business [in Wyoming].

*Id.* at 1309-10.

M. Morgan, Velasquez's girlfriend, also testified.  She indicated that her first use of

methamphetamine was two to three years prior to her testimony, when Velasquez gave it to her

at a party (*Id.* at 1410).  At that time, she saw Velasquez with a bag of between one-half and one

ounce of methamphetamine which Hernandez had given him (*Id.* at 1412, 1414-46).  Hernandez

had flown into Cody, Wyoming from Fresno, California (*Id.* at 1415).  Not long after they began

dating, Velasquez also introduced M. Morgan to the Defendant and Renteria, both of whom were

living in Sheridan, Wyoming (*Id.* at 1418-19).

M. Morgan testified that she heard Velasquez refer to himself, Renteria, the Defendant,

Garcia and Hernandez as "hustlers" (*Id.* at 1517-18).  Her "understanding" was that the reference

meant "selling drugs, making money, and not having to work" (*Id.* at 1518).  She also identified

a photograph of Velasquez, Renteria and the Defendant, dressed in Fresno Bulldog clothing, that

she took at a bar in Sheridan (*Id.* at 1513; Exhibit 327).

M. Morgan testified that when she moved into a home in Basin with Velasquez in 2008

or early 2009 (*Id.* at 1423, 1432), they would periodically receive packages:  "They would come

in small boxes.  Inside was a candle, and inside the candle was an ounce of methamphetamine"

(*Id.* at 1424).  She thought that the packages were being sent by UPS and FedEx (*Id.* at 1440).

Velasquez had told her that the packages were being sent to him from Fresno by Hernandez and

Garcia (*Id.* at 1427).

M. Morgan also testified that she once accompanied Velasquez on a trip to Fresno.  They drove the Defendant's Ford Explorer for the trip (*Id.* at 1453), which the Defendant had registered in Kimberly Perkins' name (*Id.* at 1989).  On that trip she met Garcia (*Id.* at 1456) and used methamphetamine provided by another of Velasquez's friends (*Id.* at 1457).  Velasquez also sent packages of methamphetamine back to their house in Cody (*Id.* at 1457-59).  Prior to her meeting Garcia, Velasquez told M. Morgan that Garcia was a friend of his from Fresno and that Garcia was "hooking him up with the meth" ( *Id.* at 1460).

M. Morgan had also been to Sheridan to pick up methamphetamine to sell (*Id.* at 1469).  She recalled specifically a time in the fall of 2009 when she and Velasquez drove from Basin to Sheridan, Wyoming to meet with the Defendant and Renteria (*Id.*).  On that particular trip, she and Velasquez went to an apartment at 463 Coffeen Avenue in Sheridan in order to meet with Renteria and the Defendant and to use methamphetamine with them (*Id.* at 1470).  Later on, Velasquez and M. Morgan would meet the Defendant at 456 East Burkett, a home he and Renteria moved to after they left the Coffeen Avenue apartment (*Id.* at 1473-74).

There were "at least three or four" additional trips when she went with Velasquez to Sheridan to pick up one-half to one ounce of methamphetamine from the Defendant (*Id.* at 1471).  On one such occasion, Velasquez told M. Morgan that Renteria and the Defendant were supposed to receive two packages from Fresno with an ounce of methamphetamine in each package (*Id.* at 1472).  Velasquez explained that a woman named "Kim" was receiving the packages for the Defendant and Renteria at a store where she worked (*Id.*).

The Defendant and Renteria also made the trip from Sheridan to Basin and Cody to see Velasquez.  M. Morgan specifically remembered a time when the Defendant brought methamphetamine to Velasquez at their house in Basin (*Id.* at 1475).

7

Kysar, one of Renteria's girlfriends, also testified (*Id.* at 1749).  Kysar indicated that she had started dating Renteria in September of 2009 when he was living with the Defendant on Burkett Street in Sheridan (*Id.* at 1751).  By October of 2009, Kysar had lost her job and Renteria had not been working (*Id.* at 330).  Renteria's only source of income was selling drugs (*Id.* at 331).  Renteria nonetheless covered all of Kysar's living expenses, including rent, utilities and her phone (*Id.* at 330).  According to Kysar, "[Renteria] always had money" from selling methamphetamine (*Id.* at 341).  She knew that all of Renteria's money came from selling methamphetamine, primarily, she believed, to Jason Lyles ("Lyles") and J. Morgan (*Id.* at 331).

During her nine month relationship with Renteria, Kysar witnessed him sell methamphetamine, usually in 3.5 gram amounts, "Every day ... he might have missed a few days here and there, but for the most part every day...." (*Id.*).  She also witnessed and described how Renteria would cut the methamphetamine with MSM and then re-package it for sale (*Id.* at 333-34).  She saw him do this at many places, including in the Defendant's home on Burkett (*Id.* at 334, 342).  The most she would see Renteria with at one time was one-quarter to one ounce of methamphetamine (*Id.* at 334), although once, when Renteria was gone, she and M. Morgan found "a big plastic baggie ... that looked like dope.  I mean, it was a lot" (*Id.* at 336).

Kysar further testified that Renteria told her that he was receiving the packages of methamphetamine from California, and that the packages were being shipped to Shipton's Big R in Sheridan (*Id.* at 337).  The methamphetamine was packaged inside a hollowed out candle (*Id.* at 1762).  "They" made that shipping arrangement because "their" friend, Kimberly Perkins, worked at Shipton's and received the packages there (*Id.* at 337-38).  Kysar explained that the "they" she was referring to were the Defendant and Renteria (*Id.* at 338).  She also corroborated M. Morgan's testimony that Renteria was a sometimes source for Velasquez, that Velasquez had

given Renteria a car to pay a drug debt, and that Velasquez owed money to Renteria for methamphetamine (*Id.* at 338-39).

Kysar also testified that Renteria sometimes purchased methamphetamine from the Defendant when necessary, because she knew that, at one time, Renteria owed the Defendant money for a drug debt (*Id.* at 343-44). She knew this because the Defendant had shown her a drug ledger of money that people owed him, including Renteria (*Id.* at 343-45).

Kysar had also seen the Defendant handle firearms at his home, including a pearl handled revolver, a rifle, and a "mini machine gun looking thing ... like something Rambo would use" (*Id.* at 348-49).

Danni Fox ("Fox"), another of Renteria's girlfriends, also testified (*Id.* at 1831). Fox had dated Renteria off and on between 2008 and November 2010 (*Id.* at 1836-37). She knew him in Sheridan when he lived at the apartment he shared with the Defendant on Coffeen Avenue, and then later when he shared a home with the Defendant on Burkett (*Id.* at 1838-39). She was with him in Sheridan until she moved to Gillette in December of 2009 (*Id.*). Fox also knew that Renteria was receiving packages of methamphetamine at Shipton's in Sheridan where Perkins worked (*Id.* at 1844-45). Though she did not know the details about how the methamphetamine was packaged, Renteria had told her that the packages were "not traceable" (*Id.* at 1845). She had also seen Renteria, prior to a trip he took to California, break a larger amount of methamphetamine into four smaller baggies after he cut it with a mixing agent (*Id.* at 1845-48). This occurred at the home Renteria shared with the Defendant on Burkett (*Id.* at 1847).

Jason Lyles ("Lyles") testified that he had purchased methamphetamine from Renteria from August 2009 through 2010 (*Id.* at 1864-67). Typically, Lyles would purchase an 8-ball (3.5 grams) from Renteria on a front, sell it, pay Renteria from the proceeds of the sale, and then get

another 8-ball (*Id.* at 1867-68).  Lyles said that he probably received an 8-ball, and on occasion

two or three 8-balls, from Renteria every day for "about three months or so" (*Id.* at 1871, 1904).

Lyles also described one time when Renteria asked him to collect a $1,500 drug debt from

another person (*Id.* at 1874-75).

Lyles testified that he had partied with Renteria and the Defendant at their apartment on

Coffeen Avenue in Sheridan (*Id.* at 1876).  On one such occasion, the Defendant showed Lyles

an ivory handled pistol at the Coffeen Avenue apartment (*Id.*).  He identified in court the same

pistol, which was subsequently seized from the Defendant during the search of his home and

admitted as Exhibit 207 (*Id.*).

Co-defendant Kimberly Perkins also testified (*Id.* at 1909).  Perkins stated that she had

met Renteria and the Defendant in Sheridan in 2008, though she had been acquainted with

Velasquez since late 2007 (*Id.*  at 1926, 1928).  According to Perkins, prior to August or

September of 2009, she had been drug free for some time because of her participation in a local

drug court program as a condition of her probation (*Id.* at 1920-22).  However, in approximately

September of 2009, Renteria left a bag of methamphetamine ("maybe an ounce"(*Id.* at 1923)) at

her home, and she began using again (*Id.* at 1922-23).

Since at least around Thanksgiving of 2008, Perkins had known that Renteria and the

Defendant were distributing methamphetamine because, while she was with them at their

apartment on Coffeen Avenue, she would see people come to the apartment and go with Renteria

and the Defendant into the kitchen or bedrooms (*Id.* 1928-29).  She knew, from her own history

with drug use, that these visits were drug related (*Id.* at 1929-30).  Also, by September of 2009,

she had received multiple packages of methamphetamine for Renteria (*Id.* at 1933-36), and by

then she was also purchasing methamphetamine from the Defendant for her own use and resale

(*Id.* at 1975-76).  In fact, she purchased methamphetamine from the Defendant until May of 2010 (*Id.* at 1984-85).

In regard to the packages of methamphetamine she received on Renteria's behalf, Perkins testified that in February or March of 2009 she agreed to help Renteria by accepting overnight packages of methamphetamine for him via UPS from Fresno, California (*Id.*).  Renteria paid her $250 a package (*Id.* at 1934).  Initially, the packages were sent to her house (*Id.* at 1937), but eventually they were sent to her place of work, Shipton's Big R in Sheridan (*Id.* at 1940-41).

She estimated she received one package of methamphetamine a week for Renteria from approximately March through September of 2009 (*Id.* at 1957), and then for the Defendant from approximately September of 2009 through February of 2010 (*Id.* at 1974).  The Defendant also paid Perkins $250 for each package she received (*Id.*  at 1964).  The first time she received a package for the Defendant in September of 2009, he called her from Fresno and told her that he was sending a package to her at Shipton's (*Id.* at 1973-74).

When Perkins began receiving packages for the Defendant, he told her not to tell Renteria (*Id.* at 1965).   Renteria had previously lost trust in Perkins when one package of methamphetamine that she was supposed to receive for him in September at Shipton's disappeared (*Id.* at 1960-61).  Eventually, she discovered and recovered the missing package when a customer wanted to buy a candle that was placed in inventory but had not been logged in to Shipton's system (*Id.* at 1961-62).  Perkins knew that this candle contained the missing methamphetamine because Renteria had told her that the missing methamphetamine was in a candle (*Id.* at 1962).  When she found the candle in December of 2009, after discussing with the Defendant how to approach Renteria, she gave it to Renteria at the home he shared with the

Defendant on Burkett (*Id.* at 1967-69).   The Defendant took the candle and emptied it (*Id.* at 1969-70).

Though Perkins knew that the packages she was receiving contained methamphetamine packaged, according to Renteria, in candles, it was not until January of 2010 when she gave a package to the Defendant at her home that she personally saw how the methamphetamine was packaged (*Id.* at 1957-58).   She testified that a five wick candle had been hollowed out and a plastic bag of methamphetamine had been placed inside (*Id.* at 1958, 1977-79).   She estimated that the bag of methamphetamine that she saw contained two ounces (*Id.*).

Perkins also discussed seeing the Defendant with firearms at his home (*Id.* at 1995).   At his home on Burkett, Perkins saw the Defendant's pearl handled pistol (*Id.*) and a rifle with interchangeable barrels (*Id.* at 1996-97).   She identified both of these firearms which had been seized, among other firearms, from the Defendant's home and admitted into evidence (*Id.* at 1995-97).   The Defendant had also left a gun case at her home with two bags of what looked like methamphetamine (*Id.* at 1988).   Her description of this "case" was similar to the black bag found in the Defendant's home, discussed *infra*, containing two bags of MSM and methamphetamine, along with the MP-5 machine gun (*Id.* at 948-51).

Amber Bear ("Bear") testified about her relationship with Velasquez - specifically dating him and selling methamphetamine for him on a daily basis for approximately two to three months in early 2007 (*Id.* at 2121-22).   The significance of her testimony to this appeal, however, is her testimony about who was providing methamphetamine to Velasquez.   In approximately March of 2007, she took a trip to Ogden, Utah with Velasquez and met Raymunda Correa, aka Ray-Ray ("Correa") and Paul Valles, aka Tito ("Valles") (*Id.* at 2126-33), both of whom were confirmed members of the Fresno Bulldog gang (*Id.* at 729).   According to Bear, Correa and

Valles provided very pure methamphetamine to them (*Id.* at 2133).   Correa then stayed in Wyoming for about a month and asked Bear to sell methamphetamine for him (*Id.* at 2140-41). Correa told Bear that Velasquez owed him money for drugs, and people were complaining that Velasquez was cutting the methamphetamine too much (*Id.* at 2139).   Bear was able to sell more methamphetamine for Correa because she "didn't cut the dope and didn't short people" (*Id.* at 2140).   She dealt with Correa directly for about a month until he moved back to California (*Id.* at 2141).

Western Union and Money Gram records indicate that between May of 2009 and December 2009, Renteria wired over $20,000 to Correa (*see* Govt's Exhibits 804, 812-A and 5002).   In addition, between May of 2009 and July of 2009, the Defendant wired Correa $4,600 (*see* Govt's Exhibits 803, 812-A and 5000).

The testimony of co-defendant J. Morgan, M. Morgan's brother, also directly implicated the Defendant and other gang members in the drug conspiracy.   J. Morgan testified that the first time he used methamphetamine with M. Morgan and Velasquez was at their home in Basin (*Id.* at 2377-78).   Velasquez approached J. Morgan about selling methamphetamine because of the profits that could be made (*Id.* at 2379).   Velasquez agreed to "get [J. Morgan] set up" (*Id.*).

J. Morgan stated that he learned from Velasquez that his sources for methamphetamine were Garcia and Hernandez in Fresno (*Id.*).   Velasquez told J. Morgan that Garcia was also a Fresno Bulldog and that they had grown up on Fifth Street together in Fresno (*Id.* at 2446-47).

J. Morgan began by selling small amounts (grams) of methamphetamine for Velasquez in the summer of 2009 (*Id.* at 2375, 2381-82).   However, at one point in the summer of 2009, Velasquez approached J. Morgan for a $3,000 loan in order to send it to Fresno so that each of them could get an ounce of methamphetamine (*Id.* at 2391).   J. Morgan explained that Velasquez

intended to wire the money to Fresno, and then Garcia would send the methamphetamine back to them on the inside of a hollowed-out candle (*Id.* at 2392-94). J. Morgan explained that he "was pretty demanding on the details" at the time of this particular purchase because he was concerned about lending Velasquez such a large amount of cash (*Id.* at 2392). J. Morgan ultimately picked his ounce up from Velasquez in "less than a week" (*Id.* at 2393) at Velasquez's and M. Morgan's Basin home (*Id.* at 2392).

After this initial loan to Velasquez, J. Morgan continued to receive methamphetamine from Velasquez in half-ounce and ounce quantities (*Id.* at 2399-400). J. Morgan learned from Velasquez that the packages were shipped through FedEx from Fresno overnight in candles (*Id.* at 2401). He knew that his first two ounce purchase came from Garcia, and that there were others that came from Hernandez (*Id.*).

After Velasquez's arrest in early 2010, Renteria and Kysar stopped at J. Morgan's home in Greybull, Wyoming (*Id.* at 2416-17). J. Morgan had purchased small amounts of methamphetamine from Renteria in the past (*Id.* at 2416), but Renteria was now prepared to sell him larger quantities (*Id.* at 2417). Renteria wanted J. Morgan to move ounce quantities of methamphetamine for him (*Id.* at 2418). Renteria even fronted J. Morgan an ounce to sell in the Greybull area (*Id.* at 2419). However, J. Morgan could not sell that much methamphetamine quickly enough, so on the four to six occasions that J. Morgan purchased methamphetamine from Renteria, he did so only in 8-ball, quarter ounce and half ounce quantities (*Id.* at 2419, 2421).

J. Morgan recalled one specific purchase of a half ounce of methamphetamine when he was able to provide Renteria with $800 instead of having it fronted to him (*Id.* at 2431). J. Morgan said that Renteria wanted the money up front so that he could purchase the

methamphetamine cheaper from Fresno, California directly, rather than going through the Defendant (*Id.* at 2432).

Prior to Velasquez's arrest in early 2010, J. Morgan and Velasquez had also traveled to Sheridan to purchase methamphetamine from Renteria and the Defendant at their home on Burkett (*Id.* at 2436-38).   By this time (around December of 2009), J. Morgan believed that Velasquez owed money to the gang members in Fresno and was cut off, so he had to purchase methamphetamine from Renteria and the Defendant (*Id.* at 2440).   J. Morgan contributed half the cost, or $800, to the purchase of the ounce (*Id.* at 2438).

Velasquez and Renteria both told J. Morgan about several of the Defendant's guns (*Id.* 2441), including the MP5 machine gun, which Renteria described as "one of the best guns that you can get" (*Id.*).

In addition to the foregoing eye-witnesses, the United States called John Sullivan ("Sullivan"), a fraud investigator for UPS (*Id.* at 2212).   Sullivan laid foundation for the UPS records which reflected shipments from Fresno, California to the Coffeen Avenue apartment and Burkett Street home associated with the Defendant and Renteria, as well as to Perkins at Shipton's Big R (*Id.* at 2218, 2220-2228).   The district court admitted over objection Government's Exhibit 1009, a summary of those shipping records to the Defendant, Renteria and Perkins (*Id.* at 2251; Govt's Ex. 1009).   Sullivan also explained that though he was able to locate some records associated with named defendants and addresses, the computers at different UPS locations, where he located certain records implicating Perkins, the Defendant and Renteria, were periodically purged as necessary to make room for new information (*Id.* at 2218-19). Therefore, the records he located were only those UPS was able to recover from particular terminals, and were thus not necessarily comprehensive (*Id.* at 2218).

The United States also called records custodians from Western Union Financial Services ("Western Union") and Money Gram International ("Money Gram").  Susan Carter, records custodian for Western Union, testified about Western Union records involving money sent to Raymundo Correa from Renteria and the Defendant (*Id.* at 2610-34).  The records of these transactions [Govt's Ex. 803 and 804] were admitted with no objection by any defendant (*Id.* at 2613-14).

Jennifer Hedin ("Ms. Hedin"), a custodian of records for Money Gram, testified concerning Money Gram transaction records involving the various parties (*Id.* at 2653).  In that regard, the government laid foundation for those transaction records, which were contained within a DVD produced by Money Gram [Govt's Ex. 812-A] (*Id.* at 2653-60), and those records were also admitted with no objection by any defendant (*Id.* at 2660).  Exhibit 812-A showed multiple money wires sent from Renteria and the Defendant under their various aliases to Correa. Ms. Hedin also testified that in order to pick up any money in an amount over $900, the intended recipient would need to provide the reference number and a photo identification (*Id.* at 2661-62).

SA Hall prepared a summary chart of the Money Gram transaction records that specifically implicated Renteria and the Defendant, as well as Renteria's girlfriends Kysar and Fox (*Id.* at 3009; Exhibit 5000 and 5002).  The specific transactions admitted without objection in Exhibit 812-A, and summarized over objection in Exhibit 5000 and 5002, verified that Renteria in particular, and the Defendant in lesser amounts, sent thousands of dollars to Correa in Fresno, California between May and December of 2009 (*Id.* 3011-14, 3015-17; Govt's Ex. 5000, 5001,5002, and 5003).

The Defendant's home on Burkett Street in Sheridan was searched pursuant to a warrant on November 22, 2010 (*Id.* at 912, 926).   Special Agent Jason Ruby acted as the evidence custodian during the search, and he testified about what agents discovered in the Defendant's home and in the car he was driving at the time of his arrest (*Id.* at 927).   SA Ruby identified for the jury several items of evidence seized from the home and car:

•       A Taurus PT1911 pistol and .38 caliber magazine located between the mattresses in the Defendant's bedroom, along with a holster used to carry the handgun in a concealed manner ( *Id.* at 944-45, 2845-46; Govt's Ex. 501);

•       A loaded Taurus PT92 AFS 9 millimeter handgun, with a pearl handle and a laser site located in the Defendant's bedroom dresser (*Id.* at 942-43, 2846; Govt's Ex. 505);

•       A Savage Stevens Model 200, .308 caliber bolt action rifle hanging from the headboard in the Defendant's bedroom with an ammunition pouch attached to the stock (*Id.* at 943-44, 2842, Govt's Ex. 506);

•       A Chinese Type 56 SKS assault rifle with a high capacity magazine located on the bookshelf in the living room (*Id.* at 946-47, 2840, 2843; Govt's Ex. 502 and 510);

•       A Ross Trifecta .22 long rifle also found on the bookshelf in the living room, along with two additional barrels to convert the rifle to a .243 rifle and to a 20-gauge shotgun ( *Id.* at 947-48);

•       A black bag found in the living room containing an MP-5 machine gun, two bags of a crystalline substance containing a detectable amount of methamphetamine, a digital scale with weigh pan, assorted ammunition, and a banana clip for an SKS assault rifle (*Id.* at 948-51; Govt's Ex. 509);

•       A photograph of three males, including the Defendant, each of them holding either the MP-5, the SKS assault rifle, or the .308 rifle seized from the Defendant's home (*Id.* at 967);

•       A box of 9 millimeter ammunition taken from the dining room (*Id.* at 969);

•       A 9 millimeter magazine seized from the Defendant's bedroom (*Id.* at 969);

•        A Taurus handgun box and spent .308 shell casings located in the living room (*Id.* at 969-70);

•        Photographs of the Defendant with Velasquez and Renteria seized from the Defendant's bedroom (*Id.* at 972);

•        Various documents found in the Defendant's home showing his ownership of the home and his use of various aliases (*Id.* at 976-79, 987);

•        Carbon copies of checks indicating payments made on Perkins's Ford Explorer, and the registration to the Ford Explorer (*Id.* at 978, 981);

•        .38 caliber super rounds, a 9 millimeter round, and a .38 Special round seized from the Defendant's car (*Id.* at 970-71).

Following SA Ruby's testimony, Josh Williams ("Williams") from the DCI Crime Laboratory testified that the two bags of "white crystalline substance," weighing 34.195 grams and 62.950 grams respectively (Exhibits 106 and 107), seized from the black duffle bag in the Defendant's living room both tested positive for the presence of methamphetamine (*Id.* at 154-158 and 241-42).   Williams discussed how both bags contained a small amount of methamphetamine (*Id.* at 246, 250), with the remaining substance testing as MSM, a substance commonly used as a cutting agent for methamphetamine (*Id.* at 250).  A digital scale and weigh pan, seized from the same black bag, also tested positive for methamphetamine (Exhibit 108) (*Id.* at 242).[4]

---

[4] The Defendant called his own expert witness, Brian Starbuck, with respect to Williams' testing of the alleged methamphetamine seized from the Defendant's black duffle bag (*see* Trial Tr., Vol. XV, at 88-141).  Starbuck took no issue with the scientific tests Williams employed to test the substances seized from the Defendant's duffle bag, and he specifically agreed that those tests ultimately indicated the presence of methamphetamine in both the two bags and in the residue from the digital scale/weigh pan (*Id.* at 137-39).  His concern was only with respect to Exhibit 107 (the 62 gram baggie), where he claimed the positive methamphetamine result "could" have been caused by contamination, although he had no evidence of that (*Id.* at 117, 128).  Mr. Starbuck harbored no similar doubts, however, with respect to the results for Exhibit 106 (the 34 gram baggie) (*Id.* at 139).

When testifying on rebuttal, Josh Williams rejected Starbuck's concern, because it was based on an assumption that the substances in the bags were uniform and homogenous, and that was not correct (Trial Tr., Vol. XV, at 143-150).

Special Agent Michael Knapp of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("SA Knapp"), a firearms enforcement officer, testified as an expert about the various firearms and ammunition seized from the Defendant's home and car (*Id.* at 2842-2847), and in particular about the MP-5 machine gun that was seized from the black duffle bag in the Defendant's house (*Id.* at 2848).  SA Knapp explained that the MP-5 was originally designed as a semi-automatic, but that the seized MP-5 had been manually converted to a fully automatic machine gun (*Id.* at 2849-50).  He also discussed the shortened, illegal, eight inch barrel (*Id.*). SA Knapp described to the jury how all of the identifying marks on the MP-5, including serial number, manufacturer, caliber and model, had been removed with a tool after the firearm had left the factory (*Id.* at 2850-51).  Finally, SA Knapp told the jury that he test fired the MP-5 and "managed to fire one ten-round automatic burst and numerous three-, four- and five-round automatic bursts" (*Id.* at 2853).  Based on his examination, the MP-5 qualified as a machine gun capable of firing 9 millimeter ammunition (*Id.* at 2854, 2857).

On the basis of all the foregoing evidence, the jury returned its verdicts of guilty.

### ARGUMENT

As noted above, the Defendant has raised two issues in his § 2255 motion.  First, he says his lawyer was constitutionally ineffective for not seeking independent testing of the two baggies containing methamphetamine which were seized from the black duffle bag in his house, and in which his machine gun was also discovered.  Second, he argues that the government's evidence with respect to Count Thirteen was not sufficient, and that conviction should accordingly be vacated.  We address these matters below.

Before doing so, however, it is important briefly to address the special rules that govern consideration of a motion to vacate under 28 U.S.C. § 2255.  First, a § 2255 motion may not test

the legality of matters which could have been resolved before this court in the first instance or on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982); *United States v. Cook*, 997 F.2d 1312, 1320 (10th Cir. 1993). A defendant who fails to raise an issue before this court or on direct appeal may present it in a § 2255 motion only if he can demonstrate cause for his procedural default, and either actual prejudice from the alleged errors, or that a fundamental miscarriage of justice will occur if his claim is not addressed. *United States v. Allen*, 16 F.3d 377, 378 (10th Cir. 1994). Moreover, where the government raises the procedural bar issues in response to a defendant's § 2255 motion, the court is obliged to address that issue and, if appropriate, dispose of the case on that basis. *Id.* 16 F.3d at 379.

In order to establish "cause," a defendant must show that there existed some external impediment which prevented him from raising the claim during the original proceedings on his case, or on direct appeal. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). A defendant could show "cause" by demonstrating that his non-compliance was the product of some kind of governmental or official interference, or that his claim was so novel that its legal basis was not reasonably available to his counsel. *Id.*, 477 U.S. at 488; *see also Reed v. Ross*, 468 U.S. 1, 16 (1984). However, neither ignorance nor inadvertence is sufficient in this regard, nor is a failure to recognize the factual or the legal basis for the claim. *Id.*

A claim of ineffective assistance of counsel is another way a defendant may overcome the procedural bar rules in a § 2255 proceeding. To establish ineffective assistance of counsel, the defendant must show that his attorney's performance was deficient and that, but for that deficient performance, there is a reasonable probability that the outcome of a proceeding involving the defendant would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993).

To prove that his lawyer's performance was deficient, the defendant must show that the attorney's performance was not within the wide range of competence demanded of attorneys in criminal cases. *Laycock v. State of New Mexico*, 880 F.2d 1184 (10th Cir. 1989). The proper standard for measuring attorney performance is not that of perfection. *United States v. Haddock*, 12 F.3d at 955-56. Rather, it is that of reasonably effective assistance. *Gillette v. Tansy*, 17 F.3d 308, 310-11 (10th Cir. 1994). Moreover, as the Tenth Circuit noted in *Gillette*, a court's review of an attorney's performance is highly deferential and must be conducted, as much as possible, without regard to the often distorting effects of hindsight. *Id.* at 311.

> Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case.

*Id.* (*quoting Strickland v. Washington*, 466 U.S. at 689).

To establish prejudice, a petitioner also has a difficult burden. He must show more than a theoretical effect on the outcome of his case as a result of his attorney's errors. Rather, he must show that, but for those errors, there is a reasonable probability that the results would have been different, *i.e.*, that he would have been acquitted, or that he would not have pleaded guilty, or that he would have received a more favorable sentence. *Strickland v. Washington*, 466 U.S. at 694; *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Lasiter v. Thomas*, 89 F.3d 699, 703 (10th Cir. 1996).

Moreover, a defendant challenging his conviction on the basis of ineffective assistance of counsel must do more than simply offer conclusory allegations; he must make particularized and specific factual averments which, if proven, would demonstrate both the ineffectiveness of his attorney's performance and the resulting prejudice to his case. *Hatch v. State of Okla.*, 58 F.3d

21

1447, 1457 (10th Cir. 1995), overruled on other grounds by *Daniels v. United States*, 254 F.3d

1180, 1188 n.1 (10th Cir. 2001); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).

In light of these standards, we address each of the Defendant's claims, in order.

### 1.      Ineffective Assistance of Counsel

The Defendant's first claim is that his attorney was constitutionally ineffective for not

seeking independent scientific testing of the alleged methamphetamine seized from his black

duffle bag during the search of his house.  This claim is without merit.

First, Defendant's counsel launched a full out assault on the government's evidence

concerning the character of the substances in the two baggies seized from his duffle bag during

the search of his residence.  As noted above in the background section of this response, the

government's expert, Josh Williams, testified extensively about his examination and testing of

the substances in the two baggies (Exhibits 106 and 107), about his conclusions that each baggy

contained at least a "detectible" amount of methamphetamine, and about his observation that the

concentrations of methamphetamine in each exhibit was likely not high, *vis a vis* the obviously

greater concentrations of MSM, a common cutting agent with which the methamphetamine was

mixed (*see, e.g.,* Trial Tr., Vol. X, at 14-16) (noting greater concentration of MSM, or methyl

sulfone).  Defendant's counsel vigorously cross-examined Mr. Williams about his testing

protocol (*Id.* at 24-68, and 72-74).  Moreover, his counsel offered his own expert chemist to

critique the government's work on this issue, but the best he could do was suggest that the

sample tested from the larger baggie (Exhibit 107) might have been contaminated, which "could"

have explained the positive methamphetamine results for that exhibit (Trial Tr., Vol. XV, at 136-

138).  He had, however, no doubt that a sample from 107 did ultimately test positive for

methamphetamine, and he had no dispute whatsoever that the other baggie seized from the

Defendant's duffle bag during the search (Exhibit 106) contained a detectible amount of methamphetamine, nor that Mr. Williams did detect methamphetamine residue on the Defendant's digital scale (*Id.* at 138-39).

At the end of the day, therefore, Defendant's counsel vigorously challenged the government's expert witness on cross-examination, and he also offered his own expert to cast as much doubt as possible on the government's evidence, at least in part.  That effort was well beyond the call of duty, probably, because the laboratory testing part of a drug case is rarely a fertile field for defense counsel to explore, and here was no exception.

To demand more on this issue - to suggest that counsel was ineffective for not going an extra mile to secure independent testing of the Defendant's methamphetamine - is simply irrational, especially in light of *Strickland's* deferential standards.  The court of appeals in *United States v. Baca*, 687 F.2d 1356 (10th Cir. 1982), in addressing a similar claim that counsel was ineffective in not seeking independent testing of alleged heroin, said counsel's judgment on this "could have been a strategic decision since the government's case would have been strengthened if [the defendant's] experts had confirmed that the substance was heroin and that information had come to the attention of the jury."  *Id.* at 1361.  So too here.  And indeed, since Defendant's expert harbored no doubts whatsoever as to the presence of methamphetamine in at least one of the Defendant's baggies based on the appropriate testing conducted by Mr. Williams, it is easy to understand why Defendant's counsel did not choose to risk a damaging result from such independent testing.

In sum, particularly given the deference the court must afford to the strategic decisions of trial counsel, it would simply be impossible in this case to say that Defendant's counsel was "completely unreasonable" in not seeking further testing.  *See Byrd v. Workman*, 645 F.3d 1159,

1168 (10th Cir. 2011) (noting that to be deficient under *Strickland*, counsel's performance must be "completely unreasonable, not merely wrong").

But even aside from the adequacy of counsel's representation on this issue, the Defendant has in any event failed to show prejudice. At best, the Defendant offers speculation that, given the low concentrations of methamphetamine found in the two baggies seized from his duffle bag, independent testing could have produced a more favorable outcome for him.[5] But speculation is all he offers. The evidence at trial - based on the testimony of two experts - indicted that there was no doubt concerning the presence of methamphetamine in one of the Defendant's baggies (Exhibit 106), and the government's expert convincingly showed why there was discovered methamphetamine in the other baggy as well (Exhibit 107). Moreover, while the Defendant's expert speculated that the positive methamphetamine finding with the other baggy (Exhibit 107) was "possibly" the product of contamination, the government's expert forcefully rejected that surmise and showed why it was off the mark (Trial Tr., Vol. XV, at 143-145).

Based on the foregoing, there is plainly nothing in the trial record that would suggest any reasonable likelihood that further independent testing of Exhibits 106 and 107 would have resulted in a finding that neither sample contained "a detectable amount" of methamphetamine. Nor does the Defendant's motion suggest such a basis - he merely says "independent

---

[5] Part of the problem that pervades the Defendant's motion is a misconception that the concentration of methamphetamine in the Defendant's baggies was a matter of importance. But it wasn't. The Defendant's indictment charged him with, *inter alia*, conspiracy to traffic in mixtures or substances containing "a detectable amount of methamphetamine" (*see* Doc. 64 [Counts One and Eleven]). The indictment in that regard employs the specific language of the operative statute, 21 U.S.C. § 841(b). The point here is that given that language, no particular concentration of methamphetamine must be present in a substance for it to fall within the ambit of § 841 - any amount will do, just so long as it is "detectible," as the methamphetamine surely was in the Defendant's baggies in his duffle bag. *See, e.g., Chapman v. United States*, 500 U.S. 453, 459 (1991); *United States v. Richards*, 87 F.3d 1152 (10th Cir. 1996) (*en banc*).

verification" of the "questionable" lab results was "warranted," and that is all (*see* Doc. 1 at 9). He suggests nothing with respect to what such "independent verification" would show.

So we are left with at best a speculation that independent testing "might" have produced a result more favorable to the Defendant, but nothing more. Such speculation is simply not sufficient for purposes of meeting the requirements of *Strickland's* prejudice prong. *Byrd v. Workman*, 645 F.3d at 1168-69; *United States v. Boone*, 62 F.3d 323, 327 (10th Cir. 1995); *United States v. Clark*, ___ F. App'x ___, 2014 WL 7331242 at *4 (10th Cir. 2014); *Moore v. McKune*, 534 F. App'x 712, 724 (10th Cir. 2013).

For the foregoing reasons, this claim must be rejected.

## 2.     Sufficiency of Evidence

The Defendant's second claim is that the evidence in support of his conviction on Count Thirteen, which charged him with possessing a machine gun in furtherance of his methamphetamine trafficking conspiracy as alleged in Count One, was legally insufficient because it failed to establish beyond a reasonable doubt that his possession of the subject machine gun was actually "in furtherance" of his drug trafficking (*see* Doc. 1 at 10-12). This claim is without merit for two reasons.

First, the Defendant raised precisely the same issue on his direct appeal, and the court of appeals resolved it against him. *See Renteria*, 720 F.3d at 1254-55. Since the issue was resolved on direct appeal, it cannot be raised again in a § 2255 motion. *See United States v. Warner*, 23 F.3d 287, 289 (10th Cir. 1994) (issues raised and resolved on direct appeal cannot be raised again in 2255 motion); *United States v. Herget*, 585 F. App'x 948, 951 (10th Cir. 2014) (unpublished) (same, citing *Warner*).

Moreover, to the extent there is some nuance to the Defendant's present argument on this issue that was not presented to the court of appeals on direct review, the Defendant <u>still</u> cannot raise the argument in a § 2255 motion unless he can show cause for that procedural default and actual prejudice.  *Frady*, 456 U.S. at 167-68; *Warner*, 23 F.3d at 291.  The Defendant makes no effort whatsoever to satisfy *Frady's* cause and prejudice requirements.  For that reason too, this claim must be rejected.  *See also Allen*, 16 F.3d at 378-79 (where procedural bar applies and government raises issue, court must enforce it).

## CONCLUSION

For all the reasons outlined above, the Defendant's § 2255 motion must be denied. Moreover, because his claims can be fully adjudicated based on the record already in existence, his demand for an evidentiary hearing must likewise be rejected.  *See Hooks. v. Workman*, 606 F.3d 715, 731 (10th Cir. 2010).

**DATED** this 2nd day of March, 2015.

Respectfully submitted,

CHRISTOPHER A. CROFTS
United States Attorney


By:     */s/ David A. Kubichek*
DAVID A. KUBICHEK
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of March, 2015, I electronically filed the foregoing

**United States' Response to Defendant's Motion under 28 U.S.C. § 2255** using the CM/ECF

system which will send notification of such filing to counsel of record.


*/s/ Vickie L. Smith*
UNITED STATES ATTORNEY'S OFFICE